**SHEEHAN & ASSOCIATES, P.C.**.
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, New York 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

-    and –

**REESE LLP**
Michael R. Reese
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
*mreese@reesellp.com*

United States District Court
Eastern District of New York                                   2:19-cv-00974-JS-GRB

| | |
|---|---|
| Ricardo Sibrian, individually and on behalf of all others similarly situated | |
| Plaintiff | First Amended Complaint |
| - against - | |
| Cento Fine Foods, Inc. | |
| Defendant | |

Plaintiff, by its attorneys, alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.      Cento Fine Foods, Inc. ("defendant") manufactures, grows, harvests distributes, markets, labels and sells canned tomatoes from Italy labeled as "Certified San Marzano" under the Cento brand name ("Products") in tin cans in sizes including, but not limited to, 28 oz.

2.      The Products are available to consumers nationwide from third-party retailers, including brick and mortar and online stores, restaurants and directly available through defendant's

website.

## I.  San Marzano Tomatoes

3.      Tomatoes are the most important fruit crop in the world, accounting for consumption of 22 and 13 million tons/day in the EU and US, respectively.[1]

4.      Tomatoes were first introduced in Europe from Central and South America at the beginning of the 16th century and initially cultivated as an ornamental plant.

5.      According to Amy Goldman, author of "The Heirloom Tomato," the San Marzano is "'the most important industrial tomato of the 20th century' as its commercial introduction in 1926 provided canneries with a sturdy, flawless subject, and breeders with genes they'd be raiding for decades."[2]

6.      Originally grown in the rich volcanic soil at the base of Mount Vesuvius near Naples, they benefit from the temperate climate, irrigated fields, and knowledge of tomato production passed down for centuries.

7.      San Marzano tomatoes were bestowed with a "Protected Designation of Origin" by the European community in the 1990s, which established parameters and qualities a tomato marketed under this name should possess.

8.      The existence of objective criteria for being represented as "San Marzano" and the creation of an independent body, the Consortium of the San Marzano Tomato, PDO (the "Consortium") that would oversee these standards, was heralded as a development to prevent other tomatoes from being passed off to consumers as San Marzano and to promote the variety abroad.

---

[1] Food and Agriculture Organization Statistics, 2010 report
[2] Benjamin Phelan, Paste Tomatoes: The Secret to Amazing Homemade Tomato Sauce, Aug. 30, 2012, Slate.com, https://slate.com/human-interest/2012/08/paste-tomatoes-the-secret-to-amazing-homemade-tomato-sauce.html

9.    Consumers have recognized the features of the San Marzano, buying them for home use or seeking out their use in restaurant dishes.

10.   Because San Marzano Tomatoes are sold in aluminum tins, cannot be seen, and are impervious to touch and smell, consumers must place their trust that the label accurately reflects its contents.

11.   The Consortium's role is to ensure that any tomatoes designated "San Marzano" have the physical characteristics consumers associate with and expect from this variety: firm flesh, high ratio of flesh to water (soluble solids), fewer seeds, bittersweet taste, less water, easily dissolving peel and consistency between tomatoes in each can and across all cans labeled as "San Marzano Tomatoes."

12.   After all the steps are complied with, the Consortium issues a stamp containing the below seals reflective of the Protected Designation of Origin ("Denominazione d'Origine Protetta") and the name of the tomato, San Marzano Tomato of the Agro Sarnese-Nocerino (geographical region of southern Italy).



13.   The Consortium also issues a unique serial number which appears beneath the two seals.



14.    Defendant's labeling of their "Certified San Marzano" tomatoes is false, misleading, deceptive, unfair and untruthful.



15.    Defendant's Products lack the physical and other characteristics associated by consumers with San Marzano Tomatoes and any seal from the certifying organization.

II.  Pre-Harvest Criteria for San Marzano Tomatoes

16.    Prior to being sold to consumers as Certified San Marzano Tomatoes, every aspect of the tomato's life-cycle is closely watched, from the seeds, hand harvesting, transport to the canning facility and transformation into the finished products.

A.  Indeterminate Tomato Variety

17.    San Marzano Tomatoes are an indeterminate tomato, as opposed to a determinate variety.

18.    Determinate tomatoes ("bush tomatoes"):

- use less land, allowing farmers to produce higher yields;

- ripen around the same time (2-3 weeks) due to lack of leaf cover, which

- are better suited for mechanized harvesting;

- grow closer to the ground and each other (about 3 feet or 0.9 meters), resulting in

- more bruising of the tomato flesh and reduction in firmness and

19.    Indeterminate tomatoes are:

- tall-growing plants that reach six to ten feet (1.8 – 3 meters);

- require more land and produce lower yields;

- supported by stakes or wire cages as they grow vertically;

- greater leaf cover which causes ripening to occur gradually,

- necessitating hand selection as opposed to mechanized harvesting.

B.  Permitted Seeds – S. Marzano 2, Kiros or Improved Strains

20.    San Marzano Tomatoes begin from seeds of the "S.Marzano 2 and KIROS varieties,"

or "improved strains of these."[3]

21.     Even slight differences among tomato varieties can be detected before the crop is even grown, impacting the quality and composition of the final product.

22.     Though some tomato varieties may appear morphologically similar, recent advances in authenticating tomato cultivars through DNA analysis based on simple sequence repeat (SSR) help to distinguish authentic products from imitations.[4]

23.     In tests carried out in 2014 and 2019, the Products were genotyped with DNA markers to determine genetic relationships between the purported "San Marzano" of Cento and actual seeds compliant with the Consortium's requirements.

24.     In 2014, seven samples were screened for similarity with seeds certified with San Marzano production, and:

> none were none were genetically identical. Genetic similarities ranged from 85% similar to 60% similar. ESTA# 7 (SL 1 H 217 SM) was most similar but that entry did have 11 missing data points thereby using 13 primers in the calculation.

**Exhibit A, Eurofins DNA Report on Cento "San Marzano" Tomatoes**, May 22, 2014.

25.     In 2019, the same analysis was carried out at the same laboratory that performed the 2014 testing.

26.     The results were similar, according to the summary of the 2019 Report:

> Comparing the 6 canned samples with San Marzano2 none were genetically identical. Genetic similarities ranged from 80% similar to 65% similar. EBDI #5888 was most similar but that entry is hybrid sample that we use as an internal control. Sample #5881 showed 36% difference with everything else. Samples #s 5883, 5885 & 5886 also showed small differences within their reps (1-2%). What impact these differences have on product quality is unknown.

---

[3] Amendment application according to Article 9, 'POMODORO S. MARZANO DELL'AGRO SARNESE-NOCERINO,' 2010 O.J. (C. 73) 42.
[4] Daria Scarano, et al. "SSR fingerprint reveals mislabeling in commercial processed tomato products." Food Control 51 (2015): 397-401; R. Rao, et al., "(GATA) 4 DNA fingerprinting identifies morphologically characterized 'San Marzano' tomato plants." Plant Breeding 125, no. 2 (2006): 173-176.

27.     Both reports reserved any comment on the connection between the Products' genetic material and attributes of product quality.

III. Physical Requirements of San Marzano Tomatoes

   A.  <u>Growing and Harvesting Requirements</u>

28.     The growing requirements of San Marzano Tomatoes contribute to the quality and composition of the final processed product.

- Vertical growing and leaf cover→ foliage covering fruit

- Gradual ripening preventing mechanized harvesting

- Hand picked gradually as tomatoes ripen→ tomatoes allowed to fully ripen →optimum flavor AND → less bruising from machinery, no contact with ground or other tomatoes

29.     For the growing phase, the plants are not subject to any height restrictions, have foliage sufficiently covering the fruit facilitating a gradual maturation[5]

   B.  <u>Yield Rates for Processed Products</u>

30.     To ensure San Marzano Tomatoes are of a consistent, high quality, all tomato fruits harvested and delivered to the canning facilities are washed, peeled, sorted and graded to include only those fruits (without bruising or rot), that exhibit typical uniform color, firmness and other

---

[5] Council Regulation (EC) No 510/2006, 'Pomodoro S. Marzano Dell'Agro Sarnese-Nocerino,' 2010 O.J. (C. 73) 44 (4.2 Description). Annex VI to Regulation (EC) No 2081 /92, Publication of an application for registration pursuant to Article 17 of Regulation (EEC), Agro Sarnese-Nocerino San Marzano Tomato, 1996 OJ L 1518/96, July 2, Section 5 (e) ("Acquisition"), p. 29 ("1996 San Marzano Specification") (The "growing method [of San Marzano Tomatoes] contributes greatly to the obtaining of high quality production, because the fruits do not come into contact with the ground, and remain intact" – there is less bruising and reduction in firmness)

acceptable attributes.

31.    The San Marzano Tomato regulations mandate the "yield in terms of processed product is no more than 80%."[6]

32.    This means that if 100 kilograms of fresh product is delivered to the canning facility, the producer is prohibited from transforming more than 80 kilograms into San Marzano Tomatoes.

33.    The result is that tomato fruits with even subtle or small defects or flaws are discarded.

34.    The Consortium tracks this metric and all canners are required to keep logs which record the amount of fresh products that are delivered each growing cycle.

35.    The canners are prohibited from converting more than 80% of that fresh product into marketable commodities.

36.    The Consortium enforces this requirement through issuance of numeric seals to be affixed to the labels, with serial numbers.

37.    The maximum number of seals a producer can obtain is limited to the number of cans required to pack 80% of the tomato fruits.

38.    The figures for the fresh tomatoes processed and transformed into San Marzano Tomatoes by the Consortium members and Cooperative Solania scrl Agricert (defendant Cento) are contained in the Campaign Reports of the respective organizations.  Exhibit C, Subject: S. Marzano DOP tomato of Agro Sarnese Nocerino, 2018 campaign data update, TR0316808444 and

---

[6] Council Regulation (EC) No 510/2006, 'Pomodoro S. Marzano Dell'Agro Sarnese-Nocerino,' 2010 O.J. (C. 73) 47 (4.5 Method of production); Annex VI to Regulation (EC) No 2081 /92, Publication of an application for registration pursuant to Article 17 of Regulation (EEC), Agro Sarnese-Nocerino San Marzano Tomato, 1996 OJ L 1518/96, July 2, Section 5 (e) ("the processed product yield reaches high levels, normally above 70%."), p. 29 ("1996 San Marzano Specification").

Exhibit D, Production Journal for 2018 season of Cooperative Solania scrl Agricert.[7]

|  | Consortium | Cooperative Solania scrl Agricert |
|---|---|---|
| Quantities Worked Fresh | 9,803,315 | 8,345,287 |
| Net Kg of Obtained Product | 6,479,648 | 7,910,800 |
| **Yield of Processed Product** | 66% | 95% |

39.    According to these figures, the Consortium's yield is roughly 30% *lower* than defendant's.

40.    This means that if the Consortium is provided 100 tomatoes (0.5 kg per tomato) by their growers, the Consortium will convert 66 tomatoes into San Marzano Tomatoes, with 1/3 unable to be used.

41.    Comparatively, Cento will keep all but five of the 100 tomatoes.

42.    In any form of selection, when items of lower relative quality are removed from a set, the average quality of the remaining items increases.

43.    This principle applies to the transformation of tomatoes into San Marzano Tomatoes.

44.    Defendant's yield rate of 95% results in the inclusion of tomatoes of lower quality – less firm, bruised, irregularly shaped and disintegrating.

45.    These characteristics are observed in the Frenkel Reports.

---

[7] *Compare* Agroqualità S.p.A. *Oggetto: Pomodoro S. Marzano Dell'Agro Sarnese Nocerino DOP, Aggiornamento Dati Campagna 2018*. Translated by Rev.com, Inc., *Oggetto: Pomodoro S. Marzano Dell'Agro Sarnese Nocerino DOP, Aggiornamento Dati Campagna 2018*. [Subject: S. Marzano DOP tomato of Agro Sarnese Nocerino, 2018 campaign data update] (Naples, Italy) 14 Feb. 2019 *with Production Journal for 2018 season of Cooperative Solania scrl Agricert*

IV. External Characteristics of San Marzano Tomatoes

46.     Certain requirements for San Marzano Tomatoes would be apparent to most consumers: uniform red color, no foreign flavor or odor, absence of parasite larvae, limited mold content and a pH value between 4.2 and 4.5.[8]

47.     The image below is of San Marzano Tomatoes on the vine.[9]



A.   <u>Length, Width and Ratio of Length to Width</u>

48.     While the standards for San Marzano Tomatoes are only provided for the fresh variety, these measurements can help distinguish real San Marzano Tomatoes from imitations.

49.     Fresh San Marzano Tomatoes have a "typical elongated parallelepiped[10] shape with

---

[8] *Compare* Annex VI to Regulation (EC) No 2081 /92, Publication of an application for registration pursuant to Article 17 of Regulation (EEC), Agro Sarnese-Nocerino San Marzano Tomato, 1996 OJ L 1518/96, July 2, pp. 26-31 ("1996 San Marzano Specification") *with* Commission Implementing Decision of 8 Apr. 2019 on the Application for approval of an amendment in accordance with the first subparagraph of Article 53(2) of Regulation (EU) No 1151/2012, 'Pomodoro S. Marzano dell'Agro Sarnese-Nocerino,' 2019 O.J. (C. 138) 2-13 ("2019 San Marzano Specification")

[9] Adriana Sacco et al., Italian Traditional Tomato Varieties: A Focus On The Campania Region, presented at Conference of the Tomaca Valenciana d'El Perelló, Cultural Space Ajuntament d'El Perelló May 17, 2017 (Valencia, Spain).

[10] A parallelpiped is "a three-dimensional figure formed by six parallelograms. By analogy, it relates to a parallelogram just as a cube relates to a square or as a cuboid to a rectangle." Parallelepiped, https://en.wikipedia.org/w/index.php?title=Parallelepiped&oldid=894968413 (last visited July 2, 2019).

a length of between 60 and 80 mm" from the stem to the end.[11]

50. The specification for the "axial ratio" – length divided by width – is 2.2 ±0.2.[12]

51. Frenkel Report 1 measured the length, in millimeters (mm) of the tomatoes in four cans of Cento "San Marzano" Tomatoes. See Table 2, Value for width and length of canned tomato fruit from 4 separate cans of CENTO SAN MARZANO ORGANIC in Exhibit E, Analysis of canned tomatoes from two different manufacturers, Dr. Chaim Frenkel, Rutgers Professor of Plant Biology, June 6, 2019.

52. The average length of the tomatoes in each can were 62.5, 63.0, 63.8 and 68.0.

53. The average width of the tomatoes in each can were 35.6, 33.0, 34.4 and 36.4.

54. The ratio of length to width for each can was 1.754, 1.909, 1.855 and 1.868.

55. The average ratio of length to width for the four cans is 1.857.

56. In contrast with the Cento "San Marzano" Tomatoes, a brand of DOP Certified San Marzano Tomatoes – Coluccio – were subjected to the same analysis.

57. The average lengths of the Coluccio for the four cans was 73.8, 72.8, 71.5 and 73.6.

58. The average widths of the Coluccio for the four cans were 35.4, 32.8, 32.9 and 33.7.

59. The ratio of length to width for each can was 2.113, 2.250, 2.173 and 2.208.

60. The average ratio of length to width for the four Coluccio cans is 2.186.

61. Because these specifications are for the fresh products and the measurements here

---

[11] Compare 1996 San Marzano Specification, 1996 OJ L VI 1518/96, July 2, pp. 26-27, Section 5(b) ("Description," "typical elongated parallelepiped shape, length of 60-80 mm measured from the peduncle to the style cicatrix.") with 2019 San Marzano Specification, 2019 O.J. (C. 138) 10, Section 3.2.2(a) ("Characteristics of fresh fruit suitable for peeling," "typical elongated parallelepiped shape with a length of between 60 and 80 mm calculated from the stem joint to the stylar end.")

[12] Compare 1996 San Marzano Specification, 1996 OJ L VI 1518/96, July 2, p. 27, Section 5(b)(B) ("axes ratio: not less than 2.2 +/- 0.2 (measured from the longitudinal axis and the greatest transversal axis in the equatorial plane;)) *with* 2019 San Marzano Specification, 2019 O.J. (C. 138) 10, Section 3.2.2(c) ("axial ratio: no less than 2,2 ± 0,2 (based on the lengths of the longitudinal axis and the widest transversal mid-section axis")).

are of the processed product, the length and width for both Cento and Coluccio would be higher in the fresh products.

62.     This is because peeling and canning causes a reduction in size of the tomatoes.

63.     Because more flesh is present in the middle of the tomatoes, the circumference likely has been reduced by a greater amount than the length would be reduced, for both Coluccio and Cento.

64.     The Coluccio length is long enough so that if its width increased relative to its length, its axial ratio would still be within the specified range, $2.2 \pm 0.2$.

65.     The Cento axial ratio is *already* outside of the specified range – 1.857 – and an increase of its width relative to length would only reduce its axial ratio further from the requirement.

V.  Internal Characteristics of San Marzano Tomatoes

66.     San Marzano Tomatoes are characterized by low water content, firm flesh, high ratio of flesh to weight, and fewer seeds.

67.     Characteristics of San Marzano Tomatoes that facilitate consumers' use in sauce, pizza, and Italian dishes of all kinds include "small seed cavities,"[13] fewer "placental pockets"[14] (the squishy, gelatin matter surrounding the seeds),[15] and a "drained product weight" no less than 60%.[16]

---

[13] 2019 San Marzano Specification, 2019 O.J. (C. 138) 10, Section 3.2.2(g) ("small seed cavities").
[14] 1996 San Marzano Specification, 1996 OJ L VI 1518/96, July 2, p. 27, Section 5(b)(F)  ("reduced presence of placental pockets").
[15] Patricia Waldron, From Flower to Fruit: Study Reveals Details of Tomato Formation, Boyce Thompson Institute, Aug 14, 2015, https://btiscience.org/explore-bti/news/post/flower-fruit-study-reveals-details-tomato-formation/.
[16] 2010 O.J. (C. 73) 44 (4.2.2).2019 O.J. (C. 138) 11 (3.2. Description of product to which the name in (1) applies)

A. Fewer Seeds and Less Water

68. The low water content means San Marzano Tomatoes have a high ratio of flesh to weight.

69. This produces a thicker, richer sauce relative to tomatoes with higher water content.

70. A sauce made from San Marzano tomatoes will have a more concentrated flavor owing to less water, creating a distinctive combination of both sweet and tart flavors.

71. When used in pizza dough, the lack of water means the dough will not become soggy.

72. The fewer seeds of San Marzano Tomatoes enhance their value in sauce.

73. When preparing sauce, it is common to remove seeds because of their astringent taste.

74. The presence of tomato seeds also has a detrimental effect on what is supposed to be a smooth, thick texture, without hard particulates that can crack in your mouth.[17]

75. Frenkel Report 1 collected the seeds from the juice of four cans of Coluccio DOP San Marzano Tomatoes and Cento "San Marzano" Tomatoes. Exhibit E, Table 4, Weight of seeds collected from 4 cans of two manufacturers.

76. The seeds were washed, dried at 60 degrees Celsius and weighed after two days.

77. The seeds contained in the Coluccio tomatoes weighed 458 mg, while the seeds from Cento San Marzano tomatoes weighed 736 mg.

78. Sixty-one (61) percent more seeds means the tomatoes had *more* seed pockets compared to standard San Marzano Tomatoes, which typically have two seed pockets.

79. Since the gelatinous (placenta) pockets contribute sweetness to tomatoes, the presence of 61% *more* seeds will necessarily make the Cento "San Marzano" tomatoes *sweeter*,

---

[17] Giuseppe Leonardo Rotino, et al. "Open field trial of genetically modified parthenocarpic tomato: seedlessness and fruit quality." BMC biotechnology 5.1 (2005): 32.

instead of the bittersweet taste that real San Marzano Tomatoes are valued for, which is a product of *fewer* seeds.

B. <u>More Flesh</u>

80.    The weight of San Marzano Tomato fruits is required to be no less than 60% of the total product weight – tomato plus juice.[18]

81.    Drained weight is "a prerequisite quality factor for canned tomatoes" because it indicates how much of the actual can is usable solid fruit as opposed to waste, such as the juices used for packing.[19]

82.    These figures for the Coluccio and Cento tomatoes were determined by (1) emptying the contents of four cans of each variety into a strainer, (2) removing the whole tomato fruits and weighing them and (3) weighing the strained juice.  **Exhibit F, Frenkel Report 2, Weight in grams (g) of drained tomato fruit and juice from two manufacturers**, June 23, 2019, Chaim Frenkel, Rutgers University.

83.    61% more seeds means lower soluble solid content – less flesh – because of more and larger pulpy, gelatinous sacs in which the seeds are suspended (placenta pockets).

84.    The results indicated that Coluccio San Marzano Tomatoes meet the requirements of San Marzano Tomatoes with an average drained weight of 63.0%.

85.    Cento San Marzano Tomatoes have an average drained weight of 52.1%, well below the required minimum.

86.    A reason for this disparity is because the Cento "San Marzano" tomatoes

---

[18] 2019 San Marzano Specification, 2019 O.J. (C. 138) 11, Section 3.2 ("weight of drained product not less than 60 % of net weight").
[19] USDA, Agriculture Marketing Service, Canned Tomatoes (Including Stewed Tomatoes) Grading Manual, 1990.

disintegrated in the canning process, causing the fruit tissue to migrate to the juice.

C. <u>Firm Flesh</u>

87.    The firm flesh of San Marzano Tomatoes allows it to maintain its integrity throughout the canning process, so they are ideal for slicing, cutting and chopping.

88.    The difference in tissue firmness is "manifested by measurement of viscosity" – "the state of being thick, sticky, and semifluid in consistency, due to internal friction."[20] Frenkel Report 1, p.2.

89.    The juice from the Coluccio and Cento tomatoes was measured for "rate of flow through a pipette."

90.    The results indicated "the rate of flow of 28 mL of juice was 1 mL/ minute for juice of COLUCCIO S. MARZANO tomatoes but was 0.683 mL/minute for the CENTO SAN MARZANO ORGANIC tomato juice." Frenkel Report 1, p.2.

91.    The lower value of the juice from Cento "San Marzano" means "greater viscosity (resistance to flow)" due to the presence of cell wall debris from disintegrated tissue.  Frenkel Report 1, p.2.

92.    The higher value for Coluccio San Marzano tomatoes reflects the firmness of the plant tissue – it did not break apart into the juice, allowing the juice to flow faster through the pipette – lower viscosity.

93.    The viscosity measurements were repeated in Frenkel Report 2.

94.    Here, 25 mL of juice from the homogenized four cans of Coluccio and Cento were "allowed to drain from a pippete and the escape time measured."  Frenkel Report 2, p.2.

---

[20] Definition, Google Search, "viscosity."

95.     Again, the Cento tomatoes displayed a greater viscosity, taking 15 seconds to drain, compared to Coluccio, which drained in four seconds.

96.     The reason for this difference remained the disintegration of the less firm Cento tomatoes.

97.     The deficiency in the firmness of the Cento San Marzano Tomatoes compared to the DOP San Marzano is visualized in Figure 2 of Frenkel Report 1.  Exhibit A.

98.     Compared to the Cento "San Marzano" Tomatoes, the Coluccio San Marzano Tomatoes maintained their elongated shape through the canning process and had less fragmented tissue than the Cento San Marzano Tomatoes.

<u>Coluccio DOP San Marzano</u>          <u>Cento "San Marzano"</u>



99.     According to Frenkel Report 1, and the images above, some of the Cento San Marzano Tomatoes "completely disintegrated, resulting in fewer complete fruit and a higher degree of debris."

100.   However, it does not take an advanced degree in plant biology to observe differences in the Cento "San Marzano" Tomatoes (left) and D.O.P. San Marzano Tomatoes (Coluccio), as seen in the following image, taken June 27, 2019.



VI. Defendant's Representations that the Products are "Certified" are Misleading and Untrue

101.  Defendant's claims that its tomatoes are "certified" "San Marzano" tomatoes are misleading, brazen and untrue.

102.  A basic assumption of any certification scheme is a body which has the authority and expertise to bestow that certification.

103.  With respect to San Marzano Tomatoes, that entity is the Consortium.

104.  A certification is significant when products are from another country, because the consumer will have no easy way to assess or inquire as to the authenticity of the certification, and by extension, the criteria used.

A.  <u>Defendant's Labels Imitate Those of Actual Certified San Marzano Tomatoes</u>

105. Defendant's labels imitate the labels of San Marzano Tomatoes which <u>are</u> certified by the Consortium even though the Products are not "San Marzano" tomatoes.





106. For instance, defendant's front labels contain the main elements required by the Consortium and contained on actual, certified San Marzano Tomatoes.

|  | Cento | Real San Marzano (La Valle) |
|---|---|---|
| Reference to 3rd Party Evaluation | Certified | D.O.P. |
| San Marzano Tomato (Italian) | Pomodoro San Marzano | Pomodoro S. Marzano dell'Agro Sarnese-Nocerino |
| Product Contents | Peeled Tomatoes | Pomodori pelati interi, pomodori pelati a filetti |

B. The Bottoms of Defendant's Cans Even Deceive Consumer

18

107.   The bottom of all of defendant's "San Marzano" cans contribute to the deceptive practices of tricking consumers to pay a premium price for a standard Roma peel tomato.



108.   The code on the bottom of the can reads

SL1 A250 SM

10:55

109.   Initially, this code looks benign as a Julian date code which enables a manufacturer to know what facility made a particular package.

110.   "SL1" refers to a production facility of Solania, defendant's manufacturing partner.

111. "A250" refers to the day on which the product was canned – "A" designates a year and "250" means the 250th day of the year.

112. "10:55" refers to 10:55 AM.

113. While "SM" is instinctively read as referring to defendant's designation of its Products as "San Marzano," it is actually something else.

114. In the Italian canning industry, "SM" is way canners abbreviate the term "smalto," which means "enamel" in English.

115. Therefore, the "SM" contributes to the deception because it refers to the inner lining of the tin cans instead of "San Marzano."

116. Whether this was intentional or not is unknown but the result is the same: consumers are misled by the totality of defendant's practices.

C. Defendant's False and Misleading Claims of "Certification"

117. According to defendant, the Products are "certified by an independent third-party agency and are produced with the proper method to ensure superior quality."



*Distinct in flavor, these Cento® San Marzano tomatoes are grown in the Sarnese Nocerino area of Italy, renowned for its especially fruitful soil as a result of its proximity to Mount Vesuvius.*

*These San Marzano tomatoes are certified by an independent third-party agency and are produced with the proper method to ensure superior quality.*

118. This third-party agency is not the Consortium, but Agri-Cert, indicated on the Product Traceability Form, UNI EN ISO 22005:2008. Exhibit G, Agri-Cert, Certificato Di Prodotto Rintracciabilita' Di Filiera, UNI EN ISO 22005:2008 and Exhibit H, Supply Chain Product Traceability Form, UNI EN ISO 22005:2008, Translated by Rev.com, Inc.,

TR0719123709,] 30 Nov. 2017.

119. "ISO 22005" refers to a voluntary food traceability system designed to ensure product *safety*, not product quality.[21]

120. ISO 22005 limits use of their traceability framework for "promotional and commercial purposes."[22]

121. However, where products have "defined qualitative characteristics" such as a designation of product origin,

> the indications regarding regulated qualitative characteristics (e.g. product certification: PDO, PGI, TSG) may appear on certification documents provided that it is clearly stated that the regulated qualitative characteristic is not covered and is not certified against ISO 22005."

> Section 7.4.2 Traceability system applied to products with defined qualitative characteristics, p.11, Regulation for the accreditation of Certification Bodies operating certification of conformity to the standard UNI EN ISO 22005

122. Defendant's website goes on to declare that the requirements for San Marzano Tomatoes were

> created to help differentiate a true San Marzano tomato that follows the criteria from other varietal Italian tomatoes grown outside the designated region or domestically. This ensures shoppers aren't misled by non-genuine products who use the San Marzano name in their products, which, without following the strict criteria, may be inferior quality or contain a different flavor profile.

---

[21] Traceability in the feed and food chain - General principles and basic requirements for system design and implementation"

[22] Regulation for the accreditation of Certification Bodies operating certification of conformity to the standard UNI EN ISO 22005 "Traceability in the feed and food chain - General principles and basic requirements for system design and implementation"

## CENTO CERTIFIED SAN MARZANO TOMATOES

Cento Certified San Marzano Tomatoes have always been, and continue to be grown and produced in the Sarnese Nocerino area of Italy. They continue to follow the same premium-quality standards that Cento has always stood by, the standards that made us the leading brand in the United States for San Marzano tomatoes. San Marzano tomatoes are regulated and certified authentic by an independent third party, Agri-Cert, using the guidelines created to regulate San Marzano tomatoes in Italy. These guidelines were created to help differentiate a true San Marzano tomato that follows the criteria from other varietal Italian tomatoes grown outside the designated region or domestically. This ensures shoppers aren't misled by non-genuine products who use the San Marzano name in their products, which, without following the strict criteria, may be inferior quality or contain a different flavor profile.

123. Such a claim is misleading and deceptive because this entity – Agri-Cert – is not authorized nor possesses the capabilities to ensure defendant's Products meet the specifications of San Marzano Tomatoes.

124. Given that the Products' seeds and tomato fruit diverge sharply from real San Marzano Tomatoes, it is clear Agri-Cert and defendant should re-examine their priorities.

D.  <u>Regardless of Where the Products are Grown, they do not Meet Criteria for Real San Marzano Tomatoes</u>

125. Defendant's back labels tout its purported connection to the Agro Sarnese Nocerino area, the region where real, certified San Marzano Tomatoes are grown.

126. Defendant's map purports to show the area where its tomatoes are grown and even where they are canned.



127.   The label highlights "find my field" and directs the consumer to a website where they will be taken to the precise field where the Products are grown.

128.   Certain versions of the labels contain the logo of an official-looking body, the "ICEA," ("Istituto per la Certificazione Etica e Ambientale" or "Institute for Ethical and Environmental Certification").

129.   Defendant's website offers the chance to look up the exact field where the Products were grown by entering in a "lot code."

**FIND MY FIELD**

Cento Certified San Marzano Tomatoes are certified by an independent third-party agency, Argi-Cert, and produced with the proper method to ensure superior quality. From seed to shelf, our tomatoes are monitored and held to the highest of our standards. PAC Traceability (Product Attribute Certification) is the driving force behind the certification of Cento San Marzano Tomatoes. Each can comes labeled with a "lot code" as well as a best before date. These lot codes allow us to trace every can to the exact farm where the tomatoes were picked to ensure that each crop is up to our high standards. If you're interested in exactly which of our farms your can of tomatoes came from, click the button below.

*Learn More*

130.  A typical "lot code" for a recently purchased Product is "P230."

131.  However, the "lot code" conveniently corresponds to a date code, where in one formulation, P represents the year (i.e., 2017) and 230 means the 230th day of said year (subject to variations depending on implementation and usage).

132.  Additionally, entry of "lot codes" into the website brings back the same four fields, over and over.

VII. Cento's History of Fraud in San Marzano Tomato Industry

133.  The premium price of real San Marzano – approximately twice as much as non-San Marzano, Roma pole tomatoes – results in an ongoing battle against fraudulent tomatoes.

A.  Reasons for Defendant's Construction of a "Parallel Certification Scheme"

134.  This inducement to commit fraud is strengthened when your target customers are across the globe in the United States, and the Italian legal system is not known to Americans.

135.  Up until around 2011, defendant was a participant in the Consortium, as seen on its labels at that time.



136.  In the 2011 labels on the left is similar to the current label on the right.





The D.O.P. (Protected Designation of Origin) seal on this can certifies that these tomatoes are authentic San Marzano tomatoes, produced with the proper method to ensure superior quality,

These San Marzano tomatoes are certified by an independent third-party agency and are produced with the proper method to ensure superior quality.

137.  In 2011, the Carabinieri, the Italian Police,

learned that different containers with fake peeled San Marzano DOP tomatoes from the Agro Nocerino-Sarnese area (2) had been sent out, most likely from the port of Salerno, being labelled with "DE LALLO" and "CENTO" sold by the company Solania and products probably manufactured by the FRANCESE industry in Carbonara di Nola.

**Exhibit I, Report No. 85/1. Carabinieri Station, Agricultural and Food Policies, Anti-Fraud Unit of Carabinieri Salerno**, 16. Nov. 2010, Translated by Rev.com, Inc., TR0071439063; **Exhibit J, Nr.85/1. Comando Carabinieri Politiche Agricole e Alimentari, Nucleo Antifrodi Carabinieri Salerno**, 16 novembre 2010.

138.  The Carabinieri identified all the key players: defendant Cento, its importing arm, Alanric Food Distributors, located at 100 Cento Blvd, Thorofare, NJ 08086, its supplier, Solania s.r.l., and the mastermind of the scheme, Giuseppe Napoletano.

139.  The above conspirators had distributed "peeled tomatoes different in terms of origin

and quality from what was indicated on labels."  Exhibit I, p.1.

140.   The total haul of counterfeit tomatoes approached 300,000 cans, the largest seizure in decades.

141.   The full scope and depth of the scheme involved certification agents being led to "false fields" on inspection tours by Mr. Giuseppe Napoletano.  **Exhibit K, Decree Ordering the Trial, Court of Nocera Inferiore, Office Of The Preliminary Investigations Judge**, March 7, 2013, Translated by Rev.com, Inc., TR0205938741; **Exhibit L, Decreto Che Dispone Il Giudizio, Tribunale Di Nocera Inferiore, Ufficio Del Giudice Per Le Indagini Preliminari**, [date illegible].

142.   On May 15, 2019, the Court of Nocera Inferiore determined that Mr. Giuseppe Napoletano and his father, Eugenio Napoletano, founder of Solania, were "guilty of the crime they were charged with." **Exhibit M, Judgment, Court of Nocera Inferiore**, June 6, 2019, Translated by Rev.com, Inc, TR0261811954; **Exhibit N, Sentenza, Tribunale di Nocera Inferiore**, 21-05-2019, 06-06-2019.

143.   However, due to "mitigating circumstances" and the fact that the statute of limitations had elapsed between the initial seizure by the Carabinieri and the final disposition, their two year sentence was suspended.

144.   The developments in Naples would appear to confirm the longstanding suspicions about fraud by the major players in the southern Italian tomato industry.

145.   When the head of the Consortium stated that only five percent of tomatoes marked as such are real San Marzano tomatoes, there was great skepticism.[23]

---

[23] Mari Uyehara, San Marzano Tomatoes: The Fake Rolex of Canned Foods, 20 July 2017, TASTE
https://www.tastecooking.com/fake-rolex-canned-tomatoes/

146.   Even a NY Times Article about San Marzano Tomatoes raised suspicions on San Marzano tomatoes, noting they were regularly counterfeited.[24]

147.   At the time of the NY Times article, it was unknown that the seizure was much larger than 1,000 tons and the participants in the deception were the largest American importer and seller of "San Marzano" Tomatoes, defendant Cento.

The Mystery of San Marzano, NY Times



VIII.   Products are Misleading Because Descriptions are not Uniform Among Similar Foods

148.   Competitor brands in columns two and three are actually certified by the relevant

---

[24]   Nicholas Blechman, The Mystery of San Marzano, NY Times, 16 Aug. 2015, https://www.nytimes.com/interactive/2015/08/16/opinion/sunday/food-chains-mystery-of-san-marzano.html

authority, and are labeled as "San Marzano Tomato of Agro Sarnese-Nocerino Area"

  

149.  Competitor brands adjacent to defendant's on grocery shelves, are labeled as certified through the acronym, "D.O.P."

150.  The Cento San Marzano Tomatoes are misleading because, aside from not being real San Marzano Tomatoes, they are marketed as such adjacent to authentic San Marzano Tomatoes.

151.  Where two similarly labeled products are situated in the same category or section of a store and their representations as to quality and fill are identical, yet the former is lacking the quantity of the characterizing ingredient (San Marzano Tomatoes) or qualities (higher ratio of flesh, fewer seeds, firmer flesh, less water), the reasonable consumer will be deceived.

152.  Accordingly, the reasonable consumer will and does pay more money for the inferior former product under the false impression that it contains Consortium certified San Marzano tomatoes.

IX. Conclusion

153.  The labeling and appearance of the Products creates an erroneous impression that they contain San Marzano Tomatoes of equivalent quality to those bearing certification by the

28

relevant body.

154. The proportion of this component has a material bearing on price or consumer acceptance of the Products because it is more expensive and desired by consumers.

155. Had Plaintiff and Class members known the truth about the Products, they would not have bought the Product or would have paid less for it.

156. The Products contain other representations which are misleading and deceptive.

157. As a result of the false and misleading labeling, the Products are sold at premium prices – no less than $6.99 per 28 oz [794 g] excluding tax – compared to other similar products represented in a non-misleading way.

## Jurisdiction and Venue

158. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

159. Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

160. This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

161. Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

162. A substantial part of events and omissions giving rise to the claims occurred in this District.

## Parties

163. Plaintiffs are citizens of the States indicated below and reside in the county designated within that State.

164. Plaintiffs below seek to represent a national class and state sub-classes of consumers

29

in the states where they reside and purchased the products or services.

165. Plaintiff Ricardo Sibrian is a citizen of New York, Suffolk County.

166. Plaintiff Anne Marie Barletta is a citizen of Massachusetts, Norfolk County.

167. Plaintiff Danielle Dimieri is a citizen of Pennsylvania, Delaware County.

168. Plaintiff Dennis M. Friess is a citizen of Florida, Charlotte County.

169. Plaintiff Frank Fuda is a citizen of Illinois, Will County.

170. Plaintiff Kristen Ruiz is a citizen of Oregon, Yamhill County.

171. Plaintiff Geri Acquaro is a citizen of New York, Suffolk County.

172. Plaintiff Jessica McClain is a citizen of  Washington, Aberdeen County.

173. Plaintiff Rachel Parks is a citizen of Virginia, Grayson County.

174. Plaintiff Vincent Nardi is a citizen of Wisconsin, Brown County.

175. Plaintiff Kristy Frazier is a citizen of North Carolina, Davidson County.

176. Plaintiff Michele Liguori is a citizen of Connecticut, Fairfield County.

177. Jane Doe plaintiffs are citizens of the states for which the identity of a named plaintiff has not been disclosed, but who were affected in the same manner as the Named Plaintiffs.

178. The allegations as related to laws of other states where no named plaintiff has been disclosed serves as a placeholder upon joinder or amendment.

179. Defendant is a New Jersey corporation with a principal place of business in Thorofare, New Jersey (Gloucester County).

180. During the class period, Named Plaintiffs and Jane Doe Plaintiffs purchased one or more of the Products Cento San Marzano Tomatoes for personal use, consumption or application with the representations described herein, for no less than the price indicated, *supra*, excluding tax, within their states and/or other states as described.

181. Named Plaintiffs and Jane Doe Plaintiffs purchased the Products based upon the representations on the packaging.

182. Named Plaintiffs and Jane Doe Plaintiffs would consider purchasing the Products again if there were assurances that the Products' representations were no longer misleading.

<u>Class Allegations</u>

183. The classes will consist of all consumers in all 50 states with sub-classes for the individual states.

184. The Named Plaintiffs will represent their state sub-class of persons who purchased any Products containing the actionable representations during the statutes of limitations.

185. Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if Named Plaintiffs and Jane Doe Plaintiffs and class members are entitled to damages.

186. Named Plaintiffs' and Jane Doe Plaintiffs' claims and the basis for relief are typical to other members because all were subjected to the same representations.

187. Named Plaintiffs are adequate representatives because their interests do not conflict with other members.

188. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

189. Individual actions would risk inconsistent results, be repetitive and are impractical

to justify, as the claims are modest.

190. Named Plaintiffs' and Jane Doe Plaintiffs' counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

191. Plaintiffs seek class-wide injunctive relief because the practices continue.

<u>New York General Business Law ("GBL") §§ 349 & 350,
and Consumer Protection Statutes of Other States and Territories</u>

192. Named Plaintiffs and Jane Doe Plaintiffs assert causes of action under the consumer protection statutes of all 50 states, with Named Plaintiffs asserting the consumer protection laws of their individual states.

a. Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, *et. seq.*;
b. Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et. seq.*;
c. Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et. seq.*;
d. Colorado Consumer Protection Act, Colo Rev. Stat § 6-1-101, *et. seq.*;
e. Connecticut Unfair Trade Practices Act, Conn. Gen Stat § 42-110a, *et. seq.*;
f. Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et. seq.*;
g. District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et. seq.*;
h. Florida Deceptive and Unfair Trade Practices, Act *Florida Statutes* § 501.201, *et. seq.*;
i. Georgia Fair Business Practices Act, §10-1-390 *et. seq.*;
j. Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statutes § 480 1, *et. seq.* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statute § 481A-1, *et. seq.*;
k. Idaho Consumer Protection Act, Idaho Code § 48-601, *et. seq.*;
l. Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et. seq.*;
m. Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et. seq.*;
n. Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et. seq.*, and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann § 365.020, *et. seq.*;
o. Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et. seq.*;
p. Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et. seq.*, and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et. seq.*;
q. Massachusetts Unfair and Deceptive Practices Act, Mass. Gen Laws ch. 93A;
r. Michigan Consumer Protection Act, §§ 445.901, *et. seq.*;
s. Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et. seq.*; and Minnesota Uniform Deceptive Trade Practices Act, Minn Stat. § 325D.43, *et. seq.*;
t. Mississippi Consumer Protection Act, Miss. Code An. §§ 75-24-1, *et. seq.*;
u. Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*;

v. Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code § 30-14-101, *et. seq.*;

w. Nebraska Consumer Protection Act, neb. Rev. Stat. § 59 1601 *et. seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et. seq.*;

x. Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et. seq.*;

y. New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et. seq.*;

z. New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 1, *et. seq.*;

aa. New Mexico Unfair Practices Act, N.M. Sta. Ann. §§ 57 12 1, *et. seq.*;

bb. New York General Business Law ("GBL") §§ 349 & 350;

cc. North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et. seq.*;

dd. Ohio Rev. Code Ann. §§ 1345.02 and 1345.03; Ohio Admin. Code §§ 109;

ee. Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et. seq.*;

ff. Oregon Unfair Trade Practices Act, Ore. Rev. Stat. § 646.608(e) & (g);

gg. Rhode Island Unfair Trade Practices and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1 *et. seq.*;

hh. South Carolina Unfair Trade Practices Act, S.C. Code Law § 39-5-10, *et. seq.*;

ii. South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 1, *et. seq.*;

jj. Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et. seq.*;

kk. Vermont Consumer Fraud Act, Vt. Stat. Ann. Tit. 9, § 2451, *et. seq.*;

ll. Washington Consumer Fraud Act, Wash. Rev. Code § 19.86/0101, *et. seq.*;

mm. West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et. seq.*;

nn. Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100.18, *et. seq.*

193. Named Plaintiffs and Jane Doe Plaintiffs and class members assert causes of action under the consumer protection laws of their States, *supra*.

194. Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair.

195. Defendant's acts, practices, advertising, labeling, packaging, representations and omissions are not unique to the parties and have a broader impact on the public.

196. Named Plaintiffs and Jane Doe Plaintiffs reasonably believed based on defendant's representations that the Products contained San Marzano Tomatoes and possessed those attributes associated with such products as described above.

197. Named Plaintiffs and Jane Doe Plaintiffs and class members desired to purchase products which were as described by defendant and expected by reasonable consumers, given the product or service type.

198. After mailing appropriate notice and demand, plaintiffs who reside in a State where notice is required prior to seeking damages under that State's Consumer Protection Statutes, will have mailed and/or have amended the present complaint to request damages.

199. Where applicable, subclasses of plaintiffs will seek injunctive and equitable relief and attorney fees for violations of relevant law.

200. The representations and omissions were relied on by Named Plaintiffs and Jane Doe Plaintiffs and class members, who paid more than they would have, causing damages.

<u>Negligent Misrepresentation</u>

201. Named Plaintiffs and Jane Doe Plaintiffs and class members incorporate by reference all preceding paragraphs.

202. Defendant misrepresented the misrepresented the substantive, compositional, organoleptic, sensory and/or other attributes of the Products.

203. Defendant misrepresented the composition of the Products (1) by directly comparing them to another food which has definite physical and compositional attributes and (2) falsely stating the Products were equivalent and/or superior to San Marzano Tomatoes which possessed the physical and other attributes desired by consumers.

204. Defendant had a duty to disclose and/or provide non-deceptive labeling of the Products and knew or should have known same were false or misleading.

205. This duty is based, in part, on defendant's position as a (1) trusted brand who has been a provider of imported Italian food for over 50 years and (2) an entity which has held itself out as having special knowledge in the production, service and/or sale of the product or service type.

206. The representations took advantage of cognitive shortcuts made by consumers at the

point-of-sale and their trust placed in defendant.

207. Named Plaintiffs and Jane Doe Plaintiffs and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

208. Named Plaintiffs and Jane Doe Plaintiffs and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Breach of Express Warranty and Implied Warranty of Merchantability,<br>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

209. Named Plaintiffs and Jane Doe Plaintiffs incorporate by reference all preceding paragraphs.

210. Defendant manufactures and sells products which purport to be authentic, certified San Marzano Tomatoes, having definite physical, sensory and organoleptic characteristics, which are desired by consumers.

211. The Products warranted to Named Plaintiffs and Jane Doe Plaintiffs and class members that they possessed substantive, compositional, organoleptic, sensory, physical and/or other attributes when they did not.

212. As a result, the Products lacked those attributes present in certified San Marzano Tomatoes.

213. Defendant warranted to plaintiff and class members that the Products did not contain a comparatively high weight of seeds, excessive juice, less flesh and less firm flesh, when this was not truthful and was misleading.

214. Defendant had a duty to disclose and/or provide a non-deceptive description of the Products and knew or should have known same were false or misleading.

215. This duty is based, in part, on defendant's position as one of the largest sellers of

peeled Italian tomatoes in the world.

216. Named Plaintiffs and Jane Doe Plaintiffs desired to purchase products which were as described by defendant.

217. The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions and were not merchantable.

218. To the extent notice may be required, Named Plaintiffs and Jane Doe Plaintiffs either have sent or intend to send notice to defendant and reserve all rights to amendment of the complaint.

219. Named Plaintiffs, Jane Doe Plaintiffs and class members relied on defendant's claims, paying more than they would have.

<u>Fraud</u>

220. Named Plaintiffs and Jane Doe Plaintiffs incorporate by references all preceding paragraphs.

221. Defendant's intent through its scheme to "self-certify" its "San Marzano" tomatoes was to disregard the quality characteristics which the actual certifying body upholds.

222. Defendant was ejected from the Consortium for similar conduct alleged herein.

223. Defendant knew that the opaque nature of the Italian agricultural sector would prevent any third-parties in this or other countries from separating truth from fiction.

224. Defendant knew that its size – larger than all of the specialty Italian food importers to the US, combined – would prevent those people with direct knowledge of the Italian tomato industry, from speaking out, due to defendant's ability to have competitor products removed from store shelves by undercutting their prices.

225. Defendant was able to offer lower prices to retailers because its tomatoes cost less

due to the failures to adhere to quality standards expected by consumers who pay a premium price for a well-known, established product.

226. Defendant's actions were motivated by increasing their market share amongst the many rival San Marzano Tomato companies.

227. Named Plaintiffs and Jane Doe Plaintiffs and class members observed and relied on defendant's omissions and claims, causing them to pay more than they would have, entitling them to damages.

<u>Unjust Enrichment</u>

228. Named Plaintiffs and Jane Doe Plaintiffs incorporate by references all preceding paragraphs.

229. Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Named Plaintiffs and Jane Doe Plaintiffs demand a jury trial on all issues.

 **WHEREFORE,** plaintiffs pray for judgment:

1. Declaring this a proper class action, certifying named plaintiffs as representatives and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove and/or refrain from the challenged representations, restitution and disgorgement for members of the State Subclasses pursuant to the consumer protection laws of their States;

4.  Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and consumer protection law claims, and other statutory claims;

5.  Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

6.  Other and further relief as the Court deems just and proper.

Dated:   July 5, 2019

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan (SS-8533)
505 Northern Blvd., Suite 311
Great Neck, NY 11021
(516) 303-0552
spencer@spencersheehan.com

Ricardo Sibrian individually and on behalf of all others similarly situated

Plaintiff

- against -

Cento Fine Foods, Inc.

Defendant

# First Amended Complaint

Sheehan & Associates, P.C.
505 Northern Blvd., #311
Great Neck, NY 11021
Tel: (516) 303-0552
Fax: (516) 234-7800

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: July 5, 2019

/s/ Spencer Sheehan
Spencer Sheehan